IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NEREUS SHIPPING, S.A., as owner and operator of the M/T NORTH STAR<br>    Lemos Maritime Building<br>    35-39, Akti Miaouli<br>    Piraeus, Greece 185 35<br><br>              Plaintiffs,<br>  v.<br>UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. COAST GUARD NATIONAL POLLUTION FUNDS CENTER and OIL SPILL LIABILITY TRUST FUND<br><br>    Eric H. Holder, Jr.<br>    United States Attorney General<br>    950 Pennsylvania Ave., NW<br>    Washington, DC 20530<br><br>    Zane David Memeger<br>    United States Attorney's Office for<br>    the Eastern District of Pennsylvania<br>    615 Chestnut Street<br>    Philadelphia, PA  19106<br><br>    United States Coast Guard<br>    Coast Guard Headquarters<br>    Office of Claims and Litigation<br>    Room 1413<br>    2100 Second Street, SW<br>    Washington, DC 20593<br><br>              Defendants. | CIVIL ACTION<br><br>No. |

## **COMPLAINT**

Plaintiff, Nereus Shipping, S.A. ("Nereus Shipping"), as owner and operator of the M/T NORTH STAR, by and through its attorneys Rawle & Henderson LLP, alleges as follows upon information and belief:

4498062-2

1. This action seeks judicial review of the decisions and final agency action of the United States Coast Guard National Pollution Funds Center and the United States of America (hereinafter collectively the "NPFC") denying the claim of Nereus Shipping pursuant to the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701, *et seq.*, for reimbursement of uncompensated damages in connection with an oil discharge by the M/T ATHOS I into the navigable waters of the United States that occurred on November 26, 2004, on the Delaware River (hereinafter "the Oil Spill").

## JURISDICTION AND VENUE

2. Jurisdiction is proper pursuant to the following statutes: (1) 28 U.S.C. § 1331 (federal question); (2) 33 U.S.C. § 2717(b) (Oil Pollution Act); (3) 5 U.S.C. §§ 701, et seq. (Administrative Procedures Act); and (4) 28 U.S.C. § 1333 (admiralty and maritime jurisdiction)

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and 33 U.S.C. 2717(b).

## THE PARTIES

4. Plaintiff Nereus Shipping is a foreign corporation with a place of business in Piraeus, Greece. At all relevant times herein, Nereus Shipping was the owner/operator of the foreign-flagged motor tank vessel M/T NORTH STAR and a victim of the Oil Spill.

5. Defendant United States of America is named as sovereign, *eo nomine*. Defendant U.S. Coast Guard is a subcomponent or agency within Defendant U.S. Department of Homeland Security, one of the executive departments of the United States of America. Defendant NPFC administers the Fund as an agency, subdivision, office or subordinate unit of the U.S. Coast Guard. Defendant Oil Spill Liability Trust Fund is a trust fund established by statute codified at 26 U.S.C. § 9509.

**THE INCIDENT**

6.     On October 15, 2004, Nereus Shipping voyage chartered the M/T NORTH STAR to Sunoco, Inc. (hereinafter "Sunoco").  The vessel was scheduled to transport crude from West Africa to the Sunoco refineries along the Delaware River.  The rate of hire under the charter was $90,000.00 per day, *pro rata*.

7.     At approximately 2115 hours on November 26, 2004, the M/T ATHOS I struck a submerged object while attempting to dock at the Citgo Terminal in Paulsboro, New Jersey and subsequently spilled its cargo of crude oil into the Delaware River.

8.     As a result of the Oil Spill, U.S. Coast Guard officials closed the Delaware River on Saturday November 27, 2004 and ordered that all out-bound traffic had to be evaluated and, if necessary, detained and decontaminated by a Coast Guard approved decontamination unit.

9.     At the time of the ATHOS I spill, the M/T NORTH STAR was located at the Sunoco berth at Fort Mifflin.  As a result of the spill, the vessel was delayed at Fort Mifflin from 0620 on November 27, 2004 until 1610 on November 28, 2004, when the U.S. Coast Guard allowed the vessel to move to Eagle Point terminal to complete its discharge.

10.    The vessel was further delayed at Eagle Point and then at Hog Island Terminal from 1225 on November 29, 2004, until 1315 on December 2, 2004, for hull cleaning as a result of oil fouling from the ATHOS I spill.

11.    During this time, the vessel's daily market rate as established by Galbraith's Weekly Market Report for the week ending November 26, 2004, was $130,000.00 per day.

12.    On December 1, 2004, Nereus Shipping spot chartered the vessel to Sunoco for a short lightering cruise commencing at 1315 on December 2, 2004, to lighter two smaller vessels

loaded with crude offshore while awaiting clearance and future orders. The value of the spot charter was $1,004,919.06 for service from December 2, 2004, to December 9, 2004.

13. The vessel was once again delayed from 0745 on December 10, 2004, to 1940 on December 11, 2004 while being cleaned and awaiting clearance by the Coast Guard.

## **LOSS OF PROFITS AND IMPAIRMENT OF EARNING CAPACITY**

14. As a result of the ATHOS I spill and the resulting delays, the owners of the M/T NORTH STAR suffered lost profits and loss of earning capacity in the amount of $772,326.38. This amount represents the total time the vessel was delayed in the Port of Philadelphia as a result of the closing of the Delaware River, the restrictions of movement of vessels within the ATHOS I spill zone, and the need for repeated hull cleanings prior to receiving U.S. Coast Guard clearance to depart the spill zone.

15. In addition, as a result of the ATHOS I spill the owners of the M/T NORTH STAR were forced to expend $14,217.79 for increased fuel consumption and $17,816.17 for increased port expenses.

16. As a direct result of the ATHOS I spill, the owners of the M/T NORTH STAR sustained total losses in the amount of $804,360.34.

## **THE CLAIM TO THE NPFC**

17. Pursuant to the OPA, the Oil Spill Liability Trust Fund may be used for the payment of claims resulting from an oil discharge. *See* 33 U.S.C. § 2713.

18. The OPA provides that the Fund shall be available for the payment of uncompensated damages resulting from an oil discharge. *See* 33 U.S.C. § 2712. These damages include damages for loss of profits, impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources. *See* 33 U.S.C. § 2702.

19. On or about November 5, 2007, Nereus Shipping submitted an Oil Spill Liability Trust Fund Claim to the National Pollution Funds Center pursuant to 33 U.S.C. § 2713 and the implementing regulations, 33 C.F.R. § 135, *et seq*.

20. By letter dated November 27, 2007, the NPFC responded to Nereus Shipping's Claim by requesting additional information. In response to this letter, Nereus Shipping provided additional information and documentation on or about January 21, 2008.

21. Nereus Shipping's claim sought $804,360.34 in lost profits and earning capacity, plus increased fuel costs and port fees, resulting from time that the vessel was delayed during the Oil Spill, exclusive of the time period during which the vessel was spot chartered to Sunoco.

## THE NPFC'S FIRST DENIAL OF THE CLAIM

22. On August 4, 2009, the NPFC denied Nereus Shipping's Claim for the first time.

23. The NPFC determined that "an OPA event" did in fact delay and disrupt the voyages of the M/T NORTH STAR, and that Nereus Shipping demonstrated that they experienced a loss of profit resulting from the ATHOS I oil spill.

24. However, the NPFC also determined that Nereus Shipping made a profit of $1,004,919.06 by spot chartering the M/T NORTH STAR to Sunoco on December 1, 2004, and determined that Nereus Shipping failed to establish that it sustained $804,360.34 in OPA-compensable losses as a result of the Oil Spill.

## THE REQUEST FOR RECONSIDERATION OF THE CLAIM

25. On September 28, 2009, Nereus Shipping submitted to the NPFC a request for reconsideration of its denial of Nereus Shipping's claim.

26. In support of this request, Nereus Shipping submitted a number of additional exhibits to establish that the $1,004,919.06 that the vessel earned in its spot charter to Sunoco represented mitigation of damages rather than a profit.

27. In addition, Nereus Shipping noted that the NPFC made fundamental mistakes of law and fact regarding the measure and calculation of compensable damages available under the OPA.

28. Specifically, Nereus Shipping demonstrated that the NPFC erred in finding that it could not make a claim for the loss of use of its vessel for three distinct periods of delay because of the sums it received under a spot charter of the vessel for another separate time period which was greater than the loss of use during the three distinct periods of delay for which the claim was made.

29. Nereus Shipping showed that the amount claimed only represented the loss of profit and earning capacity for the periods of delay after the Oil Spill when the vessel was not spot chartered to Sunoco.

30. Nereus Shipping demonstrated to the NPFC if not for its mitigation of damages, its total losses resulting from the ATHOS I incident would have been in excess of $1,690,000.00.

## THE NPFC'S SECOND DENIAL OF THE CLAIM

31. In a second decision dated March 23, 2011, the NPFC denied Nereus Shipping's Claim for a second time.

32. The NPFC determined that "In this instance, the Delaware Bay is deemed a natural resource that was injured by the ATHOS I oil spill. Therefore, those losses or expenses that Nereus clearly demonstrates which reduced profits it would have otherwise earned, could be deemed compensable."

33. However, the NPFC noted that "While the Claimant has provided some details on the alleged periods of loss, the Claimant failed to provide information regarding the revenue stream associated with the 12/1/04 contract for the *North Star* in accordance with the regulations. Therefore, the NPFC obtained the details of the 12/1/04 contract information directly from Sunoco, the vessel's operator."

34. The NPFC concluded that Nereus Shipping failed to meet its burden of proof in establishing its overall loss when considering the increased revenues earned as a result of the Oil Spill.

35. The NPFC's final agency decision results from an improper application of admiralty and maritime law as to the calculation of damages resulting from the Oil Spill. The NPFC's determination improperly applies profits earned between December 2, 2004 and December 9, 2004, by way of mitigation of damages for that period to other periods of loss prior to and subsequent to the spot charter.

36. For these reasons, the NPFC's final agency action was arbitrary, capricious and an abuse of discretion, and otherwise not in accordance with law.

**WHEREFORE**, Nereus Shipping respectfully requests that the Court enter an Order granting the following relief:

a) Set aside NPFC's final determination of Nereus Shipping's Loss of Profit claims as (i) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law and (ii) unwarranted by the facts to the extent that the facts are subject to trial *de novo* by this Court;

b) Direct the Defendants to produce and certify for this Court the administrative record, including all information in the Defendants files pertaining to the Oil Spill;

   c)  Upon a *de novo* review of the factual and legal issues relating to the aforesaid challenged final agency adjudications, determine the amount of reimbursement properly due Nereus Shipping with respect to each of the four contested claim components;

   d)  Direct the NPFC to reimburse Nereus Shipping such amounts as determined; and

   e)  Order such other and further relief as this Honorable Court may deem just and proper.

Date:  March 22, 2013         Respectfully submitted,

                 RAWLE & HENDERSON LLP

                 By:  /s/ Gary F. Seitz
                    Gary F. Seitz (PA No. 52865)
                    The Widener Building
                    One South Penn Square, 16th Floor
                    Philadelphia, PA 19107
                    (215) 575-4200
                    Fax: (215) 563-2583
                    gseitz@rawle.com