IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NEREUS SHIPPING, S.A., as owner and operator of the M/T NORTH STAR | : : : | |
| Plaintiff, | : : | CIVIL ACTION |
| v. | : : | No. 13-cv-1522-HB |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. COAST GUARD NATIONAL POLLUTION FUNDS CENTER and OIL SPILL LIABILITY TRUST FUND | : : : : : : | |
| Defendants. | : | |

## **PLAITNIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Nereus Shipping, S.A. ("Nereus Shipping"), as owner and operator of the M/T NORTH STAR, by and through its attorneys Gellert Scali Busenkell & Brown LLC, respectfully submits this Motion for Summary Judgment against Defendants. Plaintiff asks the court to render final summary judgment against defendants, as authorized by Federal Rule of Civil Procedure 56, and in support thereof states the following uncontested material facts:

UNCONTESTED MATERIAL FACTS

1.  This action seeks judicial review of the decisions and final agency action of the United States Coast Guard National Pollution Funds Center and the United States of America (hereinafter collectively the "NPFC") denying the claim of Nereus Shipping pursuant to the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701, *et seq.*, for reimbursement of uncompensated damages in connection with an oil discharge by the M/T ATHOS I into the navigable waters of

the United States that occurred on November 26, 2004, on the Delaware River (hereinafter "the Oil Spill"). *See Defendants' Answer, Document[1] 9, para. 1.*

2. Plaintiff Nereus Shipping is a foreign corporation with a place of business in Piraeus, Greece. At all relevant times herein, Nereus Shipping was the owner/operator of the foreign-flagged motor tank vessel M/T NORTH STAR and a victim of the Oil Spill. *See Defendants' Answer, Document 9, para. 4 – (Defendants do not dispute these facts). Administrative Record, NPFC 000006-16[2]. See also Administrative Record, NPFC 000206-213.*

3. Defendant United States of America is named as sovereign, *eo nomine*. Defendant U.S. Coast Guard is a subcomponent or agency within Defendant U.S. Department of Homeland Security, one of the executive departments of the United States of America. Defendant NPFC administers the Fund as an agency, subdivision, office or subordinate unit of the U.S. Coast Guard. Defendant Oil Spill Liability Trust Fund is a trust fund established by statute codified at 26 U.S.C. § 9509. *See Defendants' Answer, Document 9, para. 5.*

4. On October 15, 2004, Nereus Shipping voyage chartered the M/T NORTH STAR to Sunoco, Inc. (hereinafter "Sunoco"). The vessel was scheduled to transport crude from West Africa to the Sunoco refineries along the Delaware River. The rate of hire under the charter was $90,000.00 per day, *pro rata*. *See Defendants' Answer, Document 9, para. 6; Administrative Record, NPFC 000206-213.*

5. On November 26, 2004, the NORTH STAR arrived at Sunoco's Fort Mifflin dock where it offloaded part of its cargo as scheduled. *Administrative Record, NPFC 000206-213.*

---

[1] "Document number" refers to the item number assigned to the document filed of record on the electronic docket for this case.
[2] The citations to the "Administrative Record" refer to the Bates labeled documents filed by the United States as the Administrative Record in the electronic docket for this case at Documents numbered 15 through 19 and 22.

6. At approximately 2115 hours on November 26, 2004, the M/T ATHOS I struck a submerged object while attempting to dock at the Citgo Terminal in Paulsboro, New Jersey and subsequently spilled part of its cargo of crude oil into the Delaware River. *See Defendants' Answer, Document 9, para. 7.*

7. The Federal On Scene Coordinator ("FOSC") issued a Notice of Federal Interest (NOFI) designating the vessel's owner, Frescati Shipping Company Limited, as the Responsible Party (RP). After it paid for costs exceeding its limit of liability, the RP denied all claims under the Oil Pollution Act of 1990 (OPA). The RP acknowledged the claim submitted by Nereus Shipping N.A. via an email dated November 16, 2007 and deemed the claim denied. (*Administrative Record, NPFC 000206-213*).

8. As a result of the Oil Spill, U.S. Coast Guard officials closed the Delaware River on Saturday November 27, 2004 and ordered that all out-bound traffic had to be evaluated and, if necessary, detained and decontaminated by a Coast Guard approved decontamination unit. *See, Administrative Record, NPFC 000222, 000267, 000269.* As late as December 11, 2004, the spill had not been cleaned up and continued to re-oil natural resources. *NPFC 000264-65.* Vessel cleaning and decontamination from the oil spill was continuing at that time. *NPFC 000265.*

9. At the time of the ATHOS I spill, the M/T NORTH STAR was located at the Sunoco berth at Fort Mifflin. As a result of the spill, the vessel was delayed at Fort Mifflin from 0620 on November 27, 2004 until 1610 on November 28, 2004, when the U.S. Coast Guard allowed the vessel to move to Eagle Point terminal to complete its discharge. *See Defendants' Answer, Document 9, para. 9.*

10. The ATHOS I oil spill occurred on November 26, 2004 which initially resulted in increased expenses to Nereus Shipping N.A. for a 34.4 hour delay of the North Star at Fort

Mifflin from 0600 on 11/27/04 until 1625 on 11/28/04.  *Administrative Record, NPFC 000206-213.*

11. The increased out of pocket expenses associated with this particular delay, but not the demurrage, were split between the owner of the North Star, Nereus Shipping N.A., and the charterer of the North Star, Sunoco in the amount of $64,000.00.  *Administrative Record, NPFC 000206-213.*

12. The vessel was further delayed at Eagle Point and then at Hog Island Terminal from 1225 on November 29, 2004, until 1315 on December 2, 2004, for hull cleaning as a result of oil fouling from the ATHOS I spill.  *See Defendants' Answer, Document 9, para. 10.*

13. During this period of time, the vessel's daily market rate as established by *Galbraith's Weekly Market Report* for the week ending November 26, 2004 for tank vessels of the NORTH STAR's class, size and configuration, was no less than $130,000.00 per day.  *See, Administrative Record, NPFC 000021, 000067-82 (relevant pages 000070 and 000072), 000085, 000191 (cited and relied upon by the NPFC), and 000193.*

14. On December 1, 2004, Nereus Shipping spot chartered the vessel to Sunoco on December 1, 2004, for lightering two vessels loaded while awaiting clearance to depart the port and its future orders; as a result, the owners earned $1,004,919.06.  *See Defendants' Answer, Document 9, para. 12.*

15. The vessel was once again delayed from 0745 on December 10, 2004, to 1940 on December 11, 2004 while being cleaned and awaiting final clearance by the Coast Guard to depart the port. *See Defendants' Answer, Document 9, para. 13.*

16. The NPFC does not dispute that as a direct and proximate result of the ATHOS I spill and the resulting delays, the owners of the M/T NORTH STAR was delayed in the Delaware River. *See Defendants' Answer, Document 9, para. 14.*

17. The oil spill related delays totaled 142 hours and 35 minutes or 5.940972 days. *See, Administrative Record, NPFC 000006-16.* A calendar chart was presented to clarify the delays associated with the claim:

08/06/2013     P05005-142     NPFC 000204

**RAWLE & HENDERSON LLP**

National Pollution Fund Center
RE: Nereus Shipping N.A. c/o C M Lemos & Co. Ltd.
September 28, 2009
Page 7

**CALENDAR VIEW OF DELAYS CAUSED BY ATHOS I SPILL**

| Nov 26, 2004 | Nov 27, 2004 | Nov 28, 2004 | Nov 29, 2004 | Nov 30, 2004 | Dec 1, 2004 | Dec 2, 2004 |
|---|---|---|---|---|---|---|
| Cargo operations Ft Mifflin | 6:20 am to 12 midnight Delay sts | 4:20 p.m. CG allows shift to Eagle Point Delay ends | 12:25 p.m. Dischg over Delay sts | Delayed all day | Delayed all day | 1:15 p.m. CG allows spot charter Delay ends |
| No lost time | Lost time: 17 h 40m | Lost time: 16h 20m | Lost time: 11h 35m | Lost time: 24h | Lost time: 24h | Lost time: 13h 15m |
| Dec 3, 2004 | Dec 4, 2004 | Dec 5, 2004 | Dec 6, 2004 | Dec 7, 2004 | Dec 8, 2004 | Dec 9, 2004 |
| Spot charter No delay | Spot charter No delay | Spot charter No delay | Spot charter No delay | Spot charter No delay | Spot charter No delay | Spot charter No delay |
| No lost time | No lost time | No lost time | No lost time | No lost time | No lost time | No lost time |
| Dec 10, 2004 | Dec 11, 2004 | | | | | |
| 7:45 a.m. Spot charter over await cleaning crew Delay sts | 7:40 p.m. Cleaning and shifting completed Delay ends | | | | | |
| Lost time: 16h 15m | Lost time: 19h 40m | | | | | |

Total of lost time: 142.75 h
Value of lost time: $773,229.64    (130000/24= 5416.67)

18.

19. In addition, a timeline was presented:



20. At the relevant period of time, the reasonable market rate for the hire of the M/T NORTH STAR ranged from a low of $90,000 per day evidenced by the last charter it was completing at the time the oil spill occurred to a high of $137,517 per day based on the published market data of similar sized and fitted tankers provided from the *Galbraith's Weekly Market Report* (*NPFC 000072*).

21. Therefore, Nereus Shipping established it suffered lost profits and loss of earning capacity during the oil spill related delay in an amount ranging between $534,687.48 and $816,984.65. This represents the total time the vessel was delayed in the Port of Philadelphia as a result of the closing of the Delaware River, the restrictions of movement of vessels within the

ATHOS I spill zone, and the need for repeated hull cleanings prior to receiving U.S. Coast Guard clearance to depart the spill zone. *See, Administrative Record, NPFC 000003, 000264 (repeated re-oiling of Tinicum Island area noted)*. This nearly six day period does not include the time that the NORTH STAR was on hire during the spill period to assist SUNOCO with two short lightering voyages through the spill zone.

22. In addition, as a result of the ATHOS I spill the owners of the M/T NORTH STAR were forced to expend $14,217.79 for increased fuel consumption and $17,816.17 for increased port expenses. *See Defendants' Answer, Document 9, para. 15 (lack sufficient information).*

23. As a direct result of the ATHOS I spill, the owners of the M/T NORTH STAR submitted a claim for total losses in the amount of $804,360.34. On or about November 5, 2007, Nereus Shipping submitted an Oil Spill Liability Trust Fund Claim to the National Pollution Funds Center pursuant to 33 U.S.C. § 2713 and the implementing regulations, 33 C.F.R. § 135, *et seq. See Defendants' Answer, Document 9, para. 19.*

24. By letter dated November 27, 2007, the NPFC responded to Nereus Shipping's Claim by requesting additional information. In response to this letter, Nereus Shipping provided additional information and documentation on or about January 21, 2008. *See Defendants' Answer, Document 9, para. 20.*

25. Nereus Shipping's claim sought $804,360.34 in lost profits and earning capacity, plus increased fuel costs and port fees, resulting from time that the vessel was delayed during the Oil Spill. *See Defendants' Answer, Document 9, para. 21.*

26. On August 4, 2009, the NPFC denied Nereus Shipping's Claim for the first time. *See Defendants' Answer, Document 9, para. 22.*

27. The NPFC determined that "an OPA event" did in fact delay and disrupt the voyages of the M/T NORTH STAR. *See Defendants' Answer, Document 9, para. 23.*

28. However, the NPFC also determined that Nereus Shipping made a profit of $1,004,919.06 by spot chartering the M/T NORTH STAR to Sunoco on December 1, 2004, and determined that Nereus Shipping failed to establish that it sustained $804,360.34 in OPA-compensable losses as a result of the Oil Spill. *See Defendants' Answer, Document 9, para. 24.*

29. On September 28, 2009, Nereus Shipping submitted to the NPFC a request for reconsideration of its denial of Nereus Shipping's claim. *See Defendants' Answer, Document 9, para. 25.*

30. In support of this request, Nereus Shipping submitted a number of additional exhibits to assist in establishing its claim. *See Defendants' Answer, Document 9, para. 26.*

31. In a second decision dated March 23, 2011, the NPFC denied Nereus Shipping's Claim for a second time. *See Defendants' Answer, Document 9, para. 31.*

32. The NPFC determined that "In this instance, the Delaware Bay is deemed a natural resource that was injured by the ATHOS I oil spill. Therefore, those losses or expenses that Nereus clearly demonstrates which reduced profits it would have otherwise earned, could be deemed compensable." *See Defendants' Answer, Document 9, para. 3; Administrative Record, NPFC 000206-213.*

33. However, the NPFC noted that "While the Claimant has provided some details on the alleged periods of loss, the Claimant failed to provide information regarding the revenue stream associated with the 12/1/04 contract for the *North Star* in accordance with the regulations. Therefore, the NPFC obtained the details of the 12/1/04 contract information from Sunoco, the

vessel's operator." *See Defendants' Answer, Document 9, para. 33; Administrative Record, NPFC 000206-213.*

34. Despite the ample evidence provided by Nereus Shipping and its collection of evidence from Sunoco, the NPFC concluded that Nereus Shipping failed to meet its burden of proof. *See Defendants' Answer, Document 9, para. 34.*

35. Nereus Shipping provided proof of its economic loss due to delay caused by the ATHOS I spill in several ways:

(1) proof of its last charter with a hire rate of $90,000 per day (*NPFC 000034, 93-95, 105, 112, 117, 119, 186-87, 315*);

(2) proof of the vessel performance for five charters including the voyage before the voyage that brought the NORTH STAR to Philadelphia, the last voyage, the two short voyages in the Delaware River system and the next charter (*NPFC 000292-316*);

(3) proof of the two voyage charters during the delay with a hire rate of $130,000 per day (*NPFC 000292-316* ); and

(4) proof of the published rates on the spot charter market during the relevant period of time which show a hire rate of more than $137,000 per day (*See, Administrative Record, NPFC 000021, 000067-82 (relevant pages 000070 and 000072), 000085, 000191 (cited and relied upon by the NPFC),and 000193*).

34. The United States does not dispute that the NORTH STAR was delayed and suffered loss as a result of the ATHOS I oil spill. The NPFC does not dispute that the ATHOS I oil spill was the cause of Nereus Shipping's claim for economic losses. The only issue before the court is the manner of calculating the economic loss suffer by Nereus Shipping.

## SUMMARY OF THE LAW

35. To recover for economic loss of use of a vessel under the maritime law, the vessel owner has the burden to show "that there was an opportunity for him to [employ the vessel], and that he would probably have availed himself of it" but for the maritime incident. *The North Star,* 151 F. 168, 175 (2d Cir. 1907). See also *The Gylfe v. The Trujillo,* 209 F.2d 386, 389 (2d Cir. 1954) (affirming the special commissioner's determination that "there was a charter market for tankers of the Glyfe's general type, that there were profitable charters available during the period in question and that the opportunity to use the Glyfe would probably have been availed of by her owner").

36. The evidence summarized above establishes that Nereus Shipping had opportunity to employ the NORTH STAR, and would probably have availed itself of such opportunity but for the ATHOS I spill that delayed the vessel in the Delaware River system.

37. Here, the NPFC erroneously denied the claim because despite the evidence summarize above it determined "… Claimant provided no documentation that the *North Star* either failed to meet a prior commitment or lost an opportunity after its 10/15/04 contract with Sunoco ended." *NPFC 000292-316.* However, under maritime law it is not necessary for the vessel to have lost a specific charter in order to claim lost profits. See *The James McWilliams,* 42 F.2d 130, 132 (2d Cir. 1930); *Standard Marine,* 708 F. Supp. 562, 564 (S.D.N.Y. 1989).

38. The NPFC acted contrary to established law when it ". . . denies this claim on reconsideration as the Claimant has failed to meet its burden of proof in establishing its overall loss when considering the increased revenues earned as a result of the Athos I oil spill incident." Claim Determination, *NPFC 000292-316.* The NPFC ignored established maritime law that lost profits may be shown by proof of the market price of a comparable vessel.

*See The Conqueror.* 166 U.S. at 127 ("The best evidence of damage suffered by detention is the sum for which vessel of the same size and class can be chartered in the market."). In addition, lost profits can he determined by the vessel's average daily earnings based on voyages preceding and following the casualty. *See The Conqueror,* 166 U.S. at 127 ("In the absence of such market value, the value of [the vessel's] use to her owner it the business in which she was engaged at the time of the collision is a proper basis for estimating damages for detention, and the books of the owner, showing tier earning about the time of her collision, are competent evidence of her probable earnings during the time of her detention.").

39. The NPFC failed to follow established law that courts (and administrative agencies) possess wide discretion in calculating a vessel's damages for lost profits. See *Brooklyn E. Dist. Terminal v. United States,* 287 U.S. 170, 176, 53 S. Ct. 103, 77 L. Ed. 240 (1932); *Turecamo,* 872 F. Supp. at 1233. The NPFC ignored that "the law is well established that an admiralty court may use equitable principles where appropriate to avoid injustice" and that "[s]uch principles play be resorted to for the purpose of making an equitable and just award of damages." *Montauk Oil Transp. Corp. v. Sonat Marine, Inc.,* 871 F.2d 1169, 1172 (2d Cir. 1989).

40. To the contrary, the NPFC erred by instead holding Nereus Shipping to a heightened standard of proof requiring "clear" evidence which is contrary to the general maritime law and the policy underlying the OPA 90: " . . . those losses or expenses that Nereus clearly demonstrates which reduced profits it would have otherwise earned, could be deemed compensable." Claim Determination, *NPFC 000292-316.*

41. The measure of detention or delay damages is "the amount the vessel would have earned in the business in which she has customarily been employed." *Moore-McCormack Lines, Inc. v. The Esso Camden,* 244 F.2d 198, 201 (2d Cir.1957).

42. Nereus Shipping established with a reasonable degree of certainty the reasonable market rate for the hire of the M/T NORTH STAR ranged from a low of $90,000 per day evidenced by the last charter it was completing at the time the oil spill occurred to a high of $137,517 per day for the oil spill related delays totaled 142 hours and 35 minutes or 5.940972 days. *The Conqueror* 166 U.S. at 125, 17 S.Ct. at 516.

**WHEREFORE**, Nereus Shipping respectfully requests the court grant this motion and render a final summary judgment in plaintiff's favor setting aside the NPFC's final determination rejecting Nereus Shipping's Loss of Profit claims as (i) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law and (ii) unwarranted by the facts and (iii) upon a *de novo* review of the factual and legal issues relating to the aforesaid challenged final agency adjudications, determine the amount of reimbursement properly due Nereus Shipping with respect to its claim and direct the NPFC to reimburse Nereus Shipping its losses for the oil spill related delay of 142 hours and 35 minutes or 5.940972 days at the hire rate of $130,000 per day.

Date: <u>November 4, 2013</u>  respectfully submitted,

                                                  GELLERT SCALI BUSENKELL & BROWN LLC

                                                  By:   <u>/s/ Gary F. Seitz</u>
                                                         Gary F. Seitz (PA No. 52865)
                                                         The Curtis Center
                                                         601 Walnut Street, Suite 280 S

Philadelphia, PA 19106
(215) 238-0010
gseitz@gsbblaw.com

CERTIFICATE OF SERVICE

    I certify that on November 4, 2013, the foregoing was filed using the Court's CM/ECF filing system, which will send electronic notification of this filing to counsel of record.

s/ Gary F. Seitz