IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NEREUS SHIPPING, S.A., as owner | : | CIVIL ACTION |
| and operator of the M/T NORTH | : | |
| STAR | : | |
| | : | |
| v. | : | |
| | : | |
| THE UNITED STATES OF AMERICA, | : | |
| et al. | : | NO. 13-1522 |

MEMORANDUM

Bartle, J.                                                    March 20, 2014

        Plaintiff Nereus Shipping, S.A. ("Nereus"), the owner

and operator of the motor tank vessel M/T North Star ("North

Star"), filed a claim for reimbursement from the Oil Spill

Liability Trust Fund (the "Fund") pursuant to the Oil Pollution

Act of 1990 ("OPA"), 33 U.S.C. § 2701.  Nereus sought recovery of

loss of profits associated with the North Star arising out of an

oil spill that occurred on November 26, 2004 in the Delaware

River.  The National Pollution Funds Center ("NPFC"), which

manages the Fund, denied Nereus' claim on the basis that Nereus

failed to establish that it had sustained a loss.  Nereus now

seeks review in this court of that decision under the

Administrative Procedures Act ("APA"), 5 U.S.C. § 706.[1]

_____

1.  Nereus has sued the United States of America, the United
States Department of Homeland Security, the United States Coast
Guard National Pollution Funds Center, the Oil Spill Liability
Trust Fund, Eric H. Holder, Jr., Zane David Memeger and the
United States Coast Guard.  Both plaintiff and defendants refer
to the defendants collectively as the United States of America.

Before the court are the parties' cross-motions for summary judgment.  Nereus seeks reversal of the NPFC's decision to deny its claim for reimbursement from the Fund, while the government asks us to affirm the agency's decision.

I.

The following facts are undisputed.  Nereus, which is a shipping corporation headquartered in Greece, owns and operates the North Star.  On October 15, 2004, Nereus chartered the North Star to Sunoco, Inc. ("Sunoco") to transport crude oil from West Africa to the Sunoco refineries along the Delaware River.  The charter between Nereus and Sunoco provided for payment based on the freight tonnage carried by the North Star using a worldscale rate.  Under the charter, Nereus would also be compensated by Sunoco if the loading and unloading of cargo took more than 72 hours total.  In that event, Sunoco would pay Nereus for the excess time, or demurrage, at a daily rate of $90,000, prorated per hour.  The 72 hours of loading time specified in the charter was exhausted before the North Star left Africa as the loading of the cargo took over four days.

On November 26, 2004 the North Star arrived at Sunoco's Fort Mifflin dock where it offloaded part of its cargo as scheduled.  The same day, the Cypriot-flagged tank vessel ATHOS I struck a submerged anchor as it approached the CITGO Asphalt Refining Company terminal in Paulsboro, New Jersey.  The anchor punctured the hull and caused the release of crude oil into the Delaware River.  The ATHOS I spill caused a 34.4 hour delay of

-2-

the North Star at Fort Mifflin from 6:00 a.m. on November 27,
2004 until 4:25 p.m. on November 28, 2004.  On the afternoon of
November 28, the Coast Guard cleared the North Star to travel
within the spill zone between Fort Mifflin and Eagle Point, and
the vessel finished unloading the remainder of its cargo on
November 29, 2004.  The North Star then shifted to the Hog Island
pier, adjacent to Fort Mifflin, to await cleaning.

Following this voyage, Nereus sent an invoice to Sunoco
for demurrage.  The invoice identified 12 days, 5 hours, and 25
minutes of laytime, including 3 days, 11 hours and 55 minutes at
Fort Mifflin/Eagle Point.  Deducting the 72 hours provided for in
the charter, Nereus requested demurrage for 9 days, 5 hours, and
25 minutes, totaling $830,312.50.  Sunoco and Nereus agreed that
they would split 50/50 the demurrage that resulted from the delay
that occurred while the North Star awaited Coast Guard permission
to travel from Fort Mifflin to Eagle Point.  Thus, the amount
Sunoco paid Nereus for demurrage, $734,021.09, included $45,000
for the aforementioned delay at Fort Mifflin.

As the North Star awaited cleaning and further orders
from Nereus, Sunoco was looking into options for lightering, that
is, transporting cargo from one vessel to another, for two of its
vessels waiting in the nearby Big Stone anchorage.  Sunoco
thereafter chartered the North Star to lighter the two vessels.
The Coast Guard granted the North Star permission to undertake
the trip with the agreement that the ship would be cleaned after
the voyage was completed.  For this spot-charter with Sunoco, the

-3-

agreed-upon rate was $130,000 per day.  Sunoco was charged for
the use of the North Star from December 2, 2004 until
December 12, 2004, minus the time it took for the North Star to
be cleaned at the end of the trip.  Sunoco paid Nereus
$1,004,919.06 for the use of the North Star and for the fuel used
during the trip.  Finally, the North Star departed the Delaware
River region on December 11, 2004, after it was cleaned.

The owner of the ATHOS I, Frescati Shipping Company
Ltd., was designated by the Federal On Scene Coordinator as the
responsible party ("RP") for the oil spill.  After it paid for
costs exceeding its limit of liability, the RP denied all claims
under the Oil Pollution Act of 1990, including a claim submitted
by Nereus.

Upon learning of the RP's denial of its claim, Nereus
submitted a claim to the NPFC seeking reimbursement from the Fund
for loss of profits and earning capacity and increased expenses
associated with the North Star.  The amount sought by Nereus
totaled $804,360.34 and was composed of lost charter hire,
totaling $772,326.38, increased fuel consumption, totaling
$14,217.79, and increased port expenses, totaling $17,816.17.  As
proof of its economic loss due to the delay caused by the ATHOS I
spill, Nereus submitted the following documentation to the NPFC:
(1) proof of its last charter with a hire rate of $90,000 per
day; (2) proof of the vessel performance for five charters
including the voyage before the October 15, 2004 Sunoco charter;
(3) proof of the published rates on the spot charter market

-4-

during the relevant period of time which show a hire rate of more than $137,000 per day.

Nereus arrived at the amount sought from the NPFC by calculating the time during which the North Star was not actively working in the Delaware River area under either the original Sunoco charter or the Sunoco spot charter.  Nereus identified the amount of time as 142.75 hours.  Nereus then multiplied that time by an alleged market rate of $130,000 per day.  Nereus did not offset the amount of its alleged lost income when the North Star was not chartered against the entire amount of its mitigating income from Sunoco and saved expenses as a result of the oil spill.  Indeed, it did not initially disclose to the NPFC the spot charter with Sunoco which resulted in additional income of $1,004,919.06.

II.

In an email dated August 4, 2009, the NPFC denied payment on Nereus' claim to the Fund.  According to the NPFC, Nereus failed to meet its burden of proof by the preponderance of the evidence that it had lost profits as a result of the oil spill:

> "While, [sic] demurrage rates may indicate a
> value of time, in and of themselves they do
> not represent an expense or lost profit
> without demonstrating they were an expense or
> that in fact that the time was lost
> opportunity.  While it is clear Nereus
> Shipping N.A. incurred increased expenses as
> a result of the Athos I oil spill, it is also
> clear that [it] gained over $1M in revenues
> from Sunoco's impromptu spot charter of the
> North Star for which Nereus Shipping would

not have made but for the Athos I oil spill..."

Nereus timely made a written request for reconsideration which was denied on March 23, 2011.  In its written denial, which constituted the NPFC's final action, the agency reiterated that Nereus had failed to account for an offset to its lost profits as required by regulations.

Having exhausted its opportunities for review at the agency level, Nereus initiated this action in March 2013 seeking reversal of the NPFC's decision.  The parties subsequently filed cross-motions for summary judgment which are now before the court.

III.

The parties have moved for summary judgment on the administrative record.  In this case we sit as an appellate tribunal charged with reviewing the NPFC's final decision pursuant to the APA.  We must determine whether the NPFC's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

When applying this standard, we must look to whether "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n v. State

Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983).  As stated in University Medical Center of Southern Nevada v. Shalala, 173 F.3d 438 (D.C. Cir. 1999),  "The question of whether [the agency] acted in an arbitrary and capricious manner is a legal one which [we] can resolve on the agency record— regardless of whether it is presented in a context of a motion for judgment on the pleadings or in a motion for summary judgment..." Id. at 440 n.3.

The standard of review this court must apply is "highly deferential," and we must "not substitute [our] own judgment for the agency's."  Nonetheless, we are not "obliged to stand aside and rubber-stamp [our] affirmance of administrative decisions that [we] deem inconsistent with a statutory mandate or that frustrate the congressional policies underlying a statute." Pa. Fed'n of Sportsmen's Clubs, Inc. v. Kempthorne, 497 F.3d 337, 347 (3d Cir. 2007) (citing NLRB v. Brown, 380 U.S. 278, 291 (1965)).

IV.

The OPA is a comprehensive oil spill response and liability statutory scheme passed in the wake of the EXXON VALDEZ spill.  The OPA establishes a strict liability scheme for oil spill removal costs and related damages and an administrative adjudication process by which the government pays eligible claims for those costs under prescribed conditions.  33 U.S.C. § 2701-2762.  The United States Coast Guard, through the NPFC, is charged with implementing the OPA, including adjudicating claims to the Fund.   See 33 U.S.C. §§ 2712-2716; 26 U.S.C. § 9509; 56

-7-

Fed. Reg. 54757.  The Fund is available to pay claims for
uncompensated removal costs and damages as defined under the OPA
and pursuant to the applicable regulations.  33 U.S.C.
§ 2712(a)(4); 33 C.F.R. § 136.205.

The OPA imposes strict liability on "each responsible
party for a vessel or a facility from which oil is discharged."
Private parties may recover three categories of damages:  real
and personal property, subsistence use, and profits and earning
capacity.  33 U.S.C. §§ 2702(b)(2)(B), (C), and (E).  A claim
must first be presented to the party responsible for the spill.
33 U.S.C. § 2713(a).  If the claim is denied by the responsible
party, the claimant may elect to sue the responsible party or
present a claim to the Fund.  33 U.S.C. § 2713(c).  Such claims
to the Fund are subject to the regulations contained in 33 C.F.R.
§ 136.

When a claimant presents a claim to the Fund, it "bears
the burden of providing all evidence, information, and
documentation deemed necessary by the Director [of the NPFC] to
support the claim."  33 C.F.R. § 136.105(a).  All claims for
uncompensated damages must include, among other things:

> (6) Evidence to support the claim.
> (7) A description of the actions taken by
> claimant, or other person on the claimant's
> behalf, to avoid or minimize... damages
> claimed.

33 C.F.R. § 136.105(e).  In addition, the Director of the NPFC
may require "any other information deemed relevant and necessary
to properly process the claim for payment."  33 C.F.R.

§ 136.105(e)(13).  In order to make a claim for "loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources," a claimant must prove:

> (a) That real or personal property, or natural resources have been injured, destroyed or lost.
> (b) That the claimant's income was reduced as a consequence of injury to, destruction of, or loss of the property or natural resources, and the amount of that reduction.
> (c) The amount of the claimant's profit or earnings in comparable periods and during the period when the claimed loss or impairment was suffered, as established by income tax returns, financial statements, and similar documents.  In addition, comparative figures for profits or earnings for the same or similar activities outside of the area affected by the incident also must be established.
> (d) Whether alternative employment or business was available and undertaken and, if so, the amount of income received.  All income that a claimant received as a result of the incident must be clearly indicated and any saved overhead and other normal expenses not incurred as a result of the incident must be established.

33 C.F.R. § 136.233.

A claimant's damages are "limited to the actual net reduction or loss of earnings or profits suffered."  33 C.F.R. § 136.235.  Claimants bear the burden of providing calculations for the net reductions or losses that clearly reflect adjustments for:

> (a) All income resulting from the incident;
> (b) All income from alternative employment or business undertaken;
> (c) Potential income from alternative employment or business not undertaken, but reasonably available;

(d) Any saved overhead or normal expenses not incurred
as a result of the incident;
(e) State, local, and Federal taxes.

33 C.F.R. § 136.235.

As previously stated, we are required to decide if the
NPFC's denial of Nereus' claim for loss of income was arbitrary,
capricious, an abuse of discretion, or contrary to law.  5 U.S.C.
§ 706(2)(A).  The crux of the matter is what proof is required by
33 U.S.C. §§ 2702(b)(2)(E) for recovery of lost profits and
earning capacity in a claim submitted to the Fund for payment.
The agency's interpretation must be given "'controlling weight
unless it is plainly erroneous or inconsistent with the
regulation.'"  Thomas Jefferson Univ. v. Shalala, 512 U.S. 504,
412 (1994) (citing Udall v. Tallman, 380 U.S. 1, 16 (1965)).  The
plain language of the regulations is the controlling factor in
our analysis.  See, e.g., Wilson v. United States Parole Comm'n,
193 F.3d 195, 199 (3d Cir. 1999).

V.

In support of its motion for summary judgment, the
United States argues that it acted properly when it denied
Nereus' claim because Nereus did not comply with the regulations
requiring certain types of evidence to establish a loss of income
due to an oil spill.

Pursuant to 33 C.F.R. § 136.233, Nereus must establish
that its "income was reduced as a consequence of" the oil spill.
The regulations required Nereus to provide "evidence to support
[its] claim" and "[a] description of the actions taken by

-10-

[Nereus] to avoid or minimize... damages claimed."  33 C.F.R. § 136.105(e).  A claimant's damages are "limited to the actual net reduction or loss of earnings or profits suffered."  33 C.F.R. § 136.235.  According to the government, Nereus failed to satisfy its burden under the regulations in three ways.

First, the regulations state that the evidence to support a claim must include "the amount of the claimant's profit or earnings in comparable periods and during the period when the claimed loss or impairment was suffered, as established by income tax returns, financial statements, and similar documents" as well as "comparative figures for profits or earnings for the same or similar activities outside of the area affected by the incident also must be established."  33 C.F.R. § 136.233(c).

Here, as set forth by the government, Nereus presented a claim seeking reimbursement at a time-charter rate of $130,000 per day for each day the North Star was idle without presenting sufficient evidence that it had expected or lost any business on such a model.  Nereus submitted five charters as evidence of the rate which it would have commanded for use of the North Star during the time in which the vessel was idle as a result of the oil spill.  Four of those charters, however, were undertaken on a lump-sum basis for the entire period of the charter and were not based on a per diem charge.  As such, they cannot reliably be used as evidence of a $130,000 per-day rate.  Moreover, Nereus provided no evidence that, but for the oil spill, it would have engaged the North Star on a per diem basis.  The only charter

undertaken on a per diem basis submitted by Nereus as evidence of
the $130,000 daily rate was the Sunoco spot charter that occurred
during the continuation of the oil spill.  Putting aside the fact
that Nereus failed initially to provide documentation of that
spot charter, it is insufficient to prove that Nereus would have
commanded a daily rate of $130,000 absent the oil spill.  We must
give effect to the entire regulation, which requires "comparative
figures for profits or earnings for the same or similar
activities <u>outside of the area affected by the incident</u>."  33
C.F.R. § 136.233(c) (emphasis added).

Second, the regulations state that a claimant must
provide documentation of "any saved overhead and other normal
expenses not incurred as a result of the incident."  33 C.F.R.
§ 136.233(d).  Nereus did not deduct any overhead or other
expenses it saved as a result of not undertaking potential
charters during the oil spill, despite the fact that it routinely
pays numerous overhead expenses such as fuel, canal fees,
insurance charges and brokerage fees and commissions.

Third, Nereus was required to document whether
"alternative employment or business was available and undertaken
and, if so, the amount of income received."  As noted by the
government, Nereus failed to offset its alleged losses with the
more than $1 million in mitigating income it received from the
Sunoco spot charter during the time of the oil spill.  The NPFC
was only alerted to the spot charter when Sunoco made its own
claim to the Fund for lost profits, including the demurrage it

-12-

paid Nereus.  Nereus subsequently provided documentation of the spot charter when it requested reconsideration of the NPFC's denial of its claim but again failed to take that income into account when calculating the damages it sought.

Nereus seeks to recover lost profits for specific days and hours when the North Star was not under charter during the continuation of the oil spill without regard to the significant extra profits it made during a part of that time due to the spot charter with Sunoco.  In other words, Nereus accounts only for alleged lost profits for hours during which its vessel was idle due to the oil spill and does not take into account either overhead expenses saved during those hours, or income received during the Sunoco spot-charter as a result of the oil spill.  We agree with the government that the regulations do not support plaintiff's argument that the period of time during which the spill affected plaintiff's vessel should be divided into separate periods in which it was idle without regard for the periods in which the vessel was making money for Nereus under a spot charter.  All of a claimant's lost profits due to the incident must be set off against all of its revenue from the incident, as well as any overhead or expenses saved as a result of the incident.  33 C.F.R. § 136.233; 33 C.F.R. § 136.235.  The evidence submitted by Nereus plainly did not comply with the regulations, which is a proper basis for denying the claim.  See Murphy Oil USA Inc. v. United States of America, 2014 U.S. Dist. LEXIS 25161, *6 (E.D. La. Feb. 27, 2014).  We find that the NPFC

-13-

did not act in an arbitrary or capricious manner or otherwise contrary to law when it denied Nereus' claim under the OPA.

Nereus posits two arguments in support of its contention that the NPFC acted arbitrarily and capriciously in denying its claims.  First, Nereus contends that the NPFC disregarded the "traditional maritime law applicable to calculating the loss of use of a vessel."  Second, Nereus argues that the NPFC held it to a higher burden of proof than what either the OPA or the agency's regulations require.  Both are without merit.

Nereus asserts that because the OPA contains an admiralty and maritime law savings provision, 33 U.S.C. § 2751, the NPFC should have followed established principles of maritime law that permit claimants to establish their loss through published spot charter records or through proof of the market price of a comparable vessel.  In support, Nereus cites several cases, some dating back to the early 19th century, to show that "maritime law follows the traditional tort policy of full compensation for tort victims and that a flexible policy to afford equity and justice is enforced in admiralty cases."

The government counters that while the NPFC may draw from general maritime law principles when adjudicating claims, it must follow the requirements of the OPA and its implementing regulations.  We agree with the government that, the savings provision notwithstanding, the plain language of the OPA and its regulations dictates the analysis that must be undertaken by the

-14-

NPFC.  Nereus has cited to no authority establishing that general
principles of maritime and admiralty law supplant the plain
language of the OPA's implementing regulations.

Nereus next argues that the NPFC held Nereus to "a high
standard and method of proof of its own creation separate and
apart from the applicable law."  In support of its argument,
Nereus points to the NPFC's use of the word "clearly" in its
denial of Nereus' claim.  The NPFC stated in its Determination
Form, "... those losses or expenses that Nereus clearly
demonstrates which reduced profits it would have otherwise
earned, could be deemed compensable."  Nereus asserts that the
NPFC should have looked "at the totality of the evidence in a
flexible manner."

The government responds that use of the word "clearly"
in a summary of its decision does not indicate that an
inappropriate standard was used, particularly when a claimant
failed to provide materials expressly required by the applicable
regulations.  We agree with the government that the NPFC did not
apply a higher standard and method of proof than required by OPA
or its regulations.  The NPFC set out the deficiencies in Nereus'
submissions with specificity and with reference to the
regulations.

In sum, we reject both of Nereus' arguments that the
NPFC acted in an arbitrary or capricious manner.  Accordingly,
the motion of plaintiff Nereus Shipping, S.A. for summary

judgment will be denied and the motion of defendants for summary judgment will be granted.